UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

CONTINENTAL TERMINALS, INC.,

        Plaintiff,

  -v-                                                        No.  11 Civ. 4869 (LTS) (FM)

WATERFRONT COMMISSION OF NEW YORK HARBOR,

        Defendant.

-------------------------------------------------------x

## MEMORANDUM ORDER

        Plaintiff Continental Terminals, Inc. ("Continental"), seeks a declaration that its warehouse operations at 112 Port Jersey Boulevard in Jersey City, New Jersey, are outside the jurisdiction of the Waterfront Commission of New York Harbor ("Commission"), and that, therefore, Continental is not required to be licensed as a stevedore and its employees are not required to be registered pursuant to the Waterfront Commission Act ("Act"), N.Y. Unconsol. Laws §§ 9801 et seq. (McKinney 2002), N.J. Stat. Ann. §§ 32:23-1 et seq.; Pub. L. No. 252, Ch. 407, 67 Stat. 541 (1953).  Continental also seeks an order permanently enjoining the Commission from requiring such registration and licensing.  Continental moves for summary judgment pursuant to Federal Rule of Civil Procedure 56, and the Commission cross-moves for summary judgment seeking a declaration that Continental's warehouse operations fall within its jurisdiction.

        The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1337. The Commission is a bi-state agency formed pursuant to a compact between New York and New Jersey in 1953, authorized by Congress in accordance with its power under Article I, Section 10,

Clause 3 of the United States Constitution.[1]  Courts have generally held that interpretation of state statutes implementing a compact presents a federal question.  See Cont'l Terminals, Inc. v. Waterfront Comm'n of New York Harbor, 486 F. Supp. 1110 (S.D.N.Y. 1980); see also Trotman v. Palisades Interstate Park Comm'n, 557 F.2d 35 (2d Cir. 1977); League to Save Lake Tahoe v. Tahoe Reg'l Planning Agency, 507 F.2d 517 (9th Cir. 1974), cert. denied, 420 U.S. 974 (1975).

For the following reasons, Plaintiff's motion for summary judgment is denied and Defendant's motion for summary judgment is granted.

## DISCUSSION

Summary judgment "shall be granted" to the movant where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is considered material "if it 'might affect the outcome of the suit under the governing law,'" and an issue of fact is a genuine one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 69 (2d Cir. 2001) (internal citations omitted).

The issue in this case is whether Continental's warehousing activities cause it to fall within the Act's definition of "stevedore."  Under the Act, stevedores operating in the Port of New York-New Jersey must be licensed by the Commission, and their employees must be registered with the Commission.  N.Y. Unconsol. Laws § 9819 (as added by L. 1953, c. 882, § 1 (pt.), Art. VI, par. 1).  The Act defines a stevedore as "a contractor (not including an employee)

---

[1] The States of New York and New Jersey enacted identical statutes to regulate waterfront activities in the Port of New York-New Jersey and Congress consented to their creation of this bi-state compact by adopting the language of the compact in Public Law 2542 in 1953.

engaged for compensation pursuant to a contract or arrangement with a carrier of freight by water, in moving waterborne freight carried or consigned for carriage by such carrier on vessels of such carrier berthed at piers, on piers at which such vessels are berthed or at other waterfront terminals." N.Y. Unconsol. Laws § 9806 (as added by L. 1953, c. 882 § 1 (pt.), Art. II; amended L. 1970, c. 951, § 1). The Act further provides that "[o]ther waterfront terminals shall include any warehouse, depot or other terminal (other than a pier) which is located within one thousand yards of any pier in the port of New York district and which is used for waterborne freight in whole or substantial part." (Id.) The Act defines "pier" as "includ[ing] any wharf, pier, dock or quay." (Id.) Thus, Continental is a stevedore if it both: (1) engages in compensated work in connection with the movement of waterborne freight; and (2) performs such work on a pier or at "other waterfront terminals." (Id.)

On April 12, 2011, the Commission issued a letter to Continental stating the Commission's determination that Continental must be licensed as a stevedore. (Complaint, Ex. A.) The Commission later stated that its finding was based on Continental's warehousing activities at 111 Port Jersey Boulevard, Jersey City ("111 Warehouse") and 112 Port Jersey Boulevard, Jersey City ("112 Warehouse"). (Complaint, Ex. D.) The Commission found that Continental is an "other waterfront terminal" because it "loads or unloads waterborne freight from containers at a warehouse, depot, or other terminal located within 1,000 yards of a pier within the Port of New York District." (Id.)

Continental advances a two-pronged challenge to the Commission's findings. First, it argues that its work does not take place at an "other waterfront terminal" because its warehouses are not within one thousand yards of any pier. Second, it argues that its warehousing

activities are not stevedoring activities, but are instead "regular warehousing activities" that are exempt from regulation under a published prior ruling by the Commission.  (Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, 5.)

The nature of Continental's warehousing activities is essentially undisputed.  Under current shipping industry practices, large cranes positioned on stringpieces[2] jutting out into the water mechanically lift containers weighing several tons from ships.  (Complaint, Ex. D.)  The cranes move these containers to a container yard at the edge of a marine terminal where containers are stored.  (Id.)  One such yard in the Port of New York District where containers are placed is the Container Yard at the Global Marine Terminal.  (Id.)  Continental "pick[s] up containerized freight" from the Global Marine Terminal's Container Yard and transports it to its facilities.  (Martocci, Sr. Dep. Tr. 7–11, October 18, 2010.)  These facilities include the 112 Warehouse.  (Id. at 12.)  There, Continental unloads the containers.  (Id. at 8.)  It then removes the contents of each container and repackages them for further delivery.  (Id.)

With respect to the first challenge, the primary dispute is over the definition of "pier."  The Commission contends that a "pier" includes the area where waterborne containerized shipments are loaded, unloaded, and stored.  Under the Commission's construction of the term, both of Continental's Port Jersey Boulevard Warehouses fall "within one thousand yards of a pier" because they are within one thousand yards of the property line of the Global

---

[2]  "Stringpiece" is defined by the U.S. Navy as "[t]he heavy square timber laying along the top of the piles forming a dock front or timber pier" and "[a] small apron between the edge of the pier and the transit shed which is wide enough for passage but not for cargo operations."  UNITED STATES NAVAL SUPPLY OPERATIONAL TRAINING CENTER, SHIPLOADING: A PICTURE-DICTIONARY OF SHIPLOADING TERMS (1945), available at http://www.history.navy.mil/library/online/shiploading_dic.htm (last visited Sept. 24, 2013).

Marine Terminal.  (Complaint, Ex. D.)  Continental argues for a narrower definition of "pier."  It argues that "a pier must be adjacent to water and that a pier is limited to the area where waterborne freight is loaded and unloaded from vessels."  (Complaint ¶ 28.)  Under Continental's proposed definition, the 111 and 112 Warehouses do not fall "within one thousand yards of a pier" because the measurement should be taken from the farthest tip of the Global Marine terminal's stringpiece.

Continental's proposed definition of "pier" is unduly narrow.  The Act defines "pier" as "any wharf, pier, dock, or quay."  Black's Law Dictionary defines "wharf" as "[a] structure on the margin or shore of navigable waters, alongside of which vessels can be brought for the sake of being conveniently loaded or unloaded, or a space of ground, artificially prepared, for the reception of merchandise from a ship or vessel, so as to promote the discharge of such vessel."  Black's Law Dictionary 1595 (6th ed. 1990) (emphasis added).  The Maritime and Shipping Dictionary defines "wharf" as "[a] structure of open, rather than solid construction, along a shore or bank which provides berthing for ships and which generally provides cargo-handling facilities."  The Maritime and Shipping Dictionary 654 (2006 ed.) (emphasis added).

These common definitions of "wharf" support the Commission's determination that Continental's subject operations are an "other marine terminal" situated "within one thousand yards of a pier."  In particular, these definitions of "wharf," a term which is used in the Act synonymously with "pier," support an interpretation of "pier" to include areas within the Global Marine Terminal, such as the Container Yard, that are used for the placement and handling of containerized freight after the containers are lifted by cranes from vessels into the terminal.

The purpose of the Act provides additional support for the broader interpretation. The Act was passed in 1953 to regulate the shipping and freighting industry in order to prevent corrupt and criminal activities that were then rampant. N.Y. Unconsol. Laws § 9802 (as added by L.1953, c. 882, § 1 (pt.), Art. I, par. 1). In 1953, much of the loading and unloading of waterborne freight occurred on the stringpieces of marine terminals. Waterfront Comm'n of New York Harbor v. Mercedes-Benz, 99 N.J. 402, 410–13 (1985). Modern shipping practices have changed the way waterborne shipments are handled. (Id.) Cargo is now packed into large freight containers. Containerized freight is carried on large vessels, and large cranes, not necessarily stationed on stringpieces, are used to move containerized freight to container yards. (Id.) There, companies receive freight and transport the containers using trucks. (Id.) Under these circumstances, it would frustrate the purpose of the Act to interpret the term "pier" so narrowly that it would exclude waterfront areas such as container yards, where containerized freight is actually handled.

Continental argues that the Commission's interpretation of the term "pier," which encompasses the whole of the Global Marine Terminal property, would be inconsistent with other uses of the word "pier" in the Act. (Plaintiff's Memorandum in Support of Motion for Summary Judgment, 4–5.) Continental cites to Section 9905(10) of the Act, a section of supplemental definitions, which provides that: "'Other waterfront terminal' shall also include any warehouse, depot, or other terminal (other than a pier) . . . which is located in a marine terminal . . . . As used in this section, 'marine terminal' means an area which includes piers." N.Y. Unconsol. Laws § 9905(10) (as added by L. 1969, c. 953). Continental contends that the Commission's construction of "pier" equates the term "pier" with "marine terminal," which the

plain language of the Act appears to foreclose.  (Id.)  It is not necessary for the Court to resolve that tension to determine the status of Continental's Port Jersey Boulevard operations.  Consistent with the statute, the Court recognizes that a "marine terminal," like the Global Marine Terminal, may, at a minimum, include a "pier" or "wharf"—an area where containerized freight is stored and handled.

Here, it is undisputed that the distance between the 112 Warehouse and the Global Marine Terminal's Container Yard is 714 yards.  (Complaint, Ex. D.)  Because the Container Yard hosts wharf operations and therefore falls squarely within the definition of a pier, this proximity is determinative of whether Continental's subject operations are an "other waterfront terminal" under Section 9806 of the Act.  The Commission, as a result, has jurisdiction over Continental's warehousing operations if the warehousing operations are stevedoring activities, a question to which the Court now turns.

The Court finds unavailing Continental's argument that its warehousing operations fall outside the scope of stevedoring activities because they fit within the "regular warehousing" exception recognized in a published prior ruling by the Commission.  Under the Commission's published ruling, "[a] warehouse, public or private, not in a marine terminal, but within 1,000 yards of a pier, does not require that the company be licensed [as a stevedore] or its employees registered if its primary function is regular warehousing (i.e., issues warehouse receipts), even though it may on occasion load or unload containers incidental to its warehouse function."  Rulings of the Waterfront Commission of New York Harbor on the Applicability of the 1969 Legislative Amendments to the Waterfront Commission Act to Certain Situations II.B.1.

Continental argues that its primary function is regular warehousing, but this argument is unsupported by the facts that Continental itself proffers. Continental, which handles shipments of coffee, picks up containerized freight from various locations, including the Global Marine Terminal, and transports the freight back to its Port Jersey Boulevard facilities. (Martocci, Jr. Dep. Tr. 26:15–24, October 24, 2012.) It brings in ten to fifteen containers to the 111 Warehouse and between one hundred and one hundred-fifty to the 112 Warehouse each week. (Id. at 27:4–9.) It unloads, or strips, freight from containers at both warehouses. (Id. at 50:2–24.) It separates coffee based on brand and type. (Id. at 60:24–61:16.) Based on customer requirements, it occasionally palletizes the coffee and straps soft coffee to the pallets to prevent the coffee from shifting on delivery. (Id. at 52:23–53:14.) It also occasionally wraps the coffee at the 112 Warehouse so that the bags do not fall off of the pallets and are not separated on delivery. (Id. at 56:10–56:24.) It performs sampling on twenty-five percent of the freight that is handled in the 111 and 112 Warehouses, meaning that Continental will draw a sample of the coffee and send it out on clients' behalf to potential buyers who taste the samples and provide approval. (Id. at 80:10–81:18; 82:25–83:7.) Continental weighs approximately ten percent of the freight that is handled in the 111 and 112 Warehouses and provides those weights to its clients for their use in contractual sales. (Id. at 81:19–82:24.) These activities are more than mere generation of receipts for "regular warehousing." The Rulings of the Commission specifically provide that "weighing and scaling," "strapping," and "sampling" are stevedoring activities requiring the companies to be licensed and their employees registered. Rulings of the Waterfront Commission of New York Harbor on the Applicability of the 1969 Legislative Amendments to the Waterfront Commission Act to Certain Situations II.A.1, 2.

CONCLUSION

For the foregoing reasons, there are no genuine disputes of material fact and the Commission is therefore entitled to summary judgment as a matter of law.  The Court hereby grants the Commission's summary judgment motion, declaring that Continental's warehousing operations located at 112 Port Jersey Boulevard, Jersey City, New Jersey, are stevedoring operations within the meaning of the Act and that Continental must therefore be licensed as such and its employees accordingly registered.[3]  Continental's motion for summary judgment is denied in its entirety.

This Memorandum Order resolves docket entries 29 and 35.  The Clerk of the Court is requested to enter judgment in the Defendant Commission's favor and close this case.


Dated: New York, New York
       September 30, 2013

                                                        /S
                                              LAURA TAYLOR SWAIN
                                              United States District Judge

---

[3] While it is clear that both warehouses are engaged in stevedoring activities, the record lacks evidence as to the precise distance from the pier area to the 111 Warehouse.